United States Court of Appeals
FOR THE ELEVENTH CIRCUIT

---

## NO. 23-12878

---

DR. LESLEY WILLIAMS

*Plaintiff-Appellant*

v.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, et al.,

*Defendants-Appellees.*

---

On Appeal from the United States DC
For the Southern District of Georgia
No.

---

## APPELLANT'S BRIEF

---

Tanya D. Jeffords
Georgia Bar No.: 390055
Law Offices of Tanya D. Jeffords and Associates, PC
437 Walker Street
Augusta, GA  30901
706-722-3019
tjeffords@jeffordslaw.com

**United States Court of Appeals**

**FOR THE ELEVENTH CIRCUIT**

DR. LESLEY WILLIAMS

*Plaintiff-Appellant*

v.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, et al.,

*Defendants-Appellees.*

On Appeal from the United States DC

For the Southern District of Georgia

## APPELLANT'S CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Circuit Rule 26.1-1, the following are all trial judges,
attorneys, persons, associations of persons, firms, partnerships, or corporations that
have an interest in the outcome of this case or appeal that are known to Appellant:

1. Arthur, Dr. Mary –  Defendant-Appellee

2. Attorney General for the State of Georgia – Counsel Defendant-Appellees
   Board of Regents of the University System of Georgia, Dr. Mary Arthur,
   Augusta University, Dr. Brooks Keel, Medical College of Georgia, and Dr.
   Steffen Meiler

3. Augusta University

4. Augusta University Health System – Defendant-Appellee

i

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
DR. LESLEY WILLIAMS v. BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA, *et al.,*
*APPELLANT'S CERTIFICATE OF INTERESTED PERSONS (Continued)*
**23-12878**

5. Augusta University Hospital

6. Augusta University Medical Center – Defendant-Appellee

7. Board of Regents of the State of Georgia – Defendant-Appellee

8. Carr, Christopher Michael – Office of Attorney General, Counsel Defendant-
   Appellees, Board of Regents of the University System of Georgia, Dr. Mary
   Arthur, Augusta University, Dr. Brooks Keel, Medical College of Georgia, and
   Dr. Steffen Meiler

9. Cathey, Thomas L. – Hull Barrett, PC, Former Counsel Defendant-Appellees
   Board of Regents of the University System of Georgia, Dr. Mary Arthur,
   Augusta University, Dr. Brooks Keel, Medical College of Georgia, and Dr.
   Steffen Meiler

10. Cook & Tolley, LLP – Counsel Defendant-Appellees Board of Regents of the
    University System of Georgia, Dr. Mary Arthur, Augusta University, Dr.
    Brooks Keel, Medical College of Georgia, and Dr. Steffen Meiler

11. Coule, Dr. Phillip – Defendant-Appellee

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
DR. LESLEY WILLIAMS v. BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA, *et al.,*
*APPELLANT'S CERTIFICATE OF INTERESTED PERSONS (Continued)*
**23-12878**

12. Coward, Elliott, Morris, Manning, & Martin, LLP – Counsel for Defendant-Appellees Augusta University Health System, Augusta University Hospital, Augusta University Medical Center, and Dr. Phillip Coule

13. Devin Hartness Smith, Cook & Tolley, LLP – Counsel Defendant-Appellees Board of Regents of the University System of Georgia, Dr. Mary Arthur, Augusta University, Dr. Brooks Keel, Medical College of Georgia, and Dr. Steffen Meiler.

14. Epps, Hon. Brian K. – DC Judge

15. Hall, Hon. Randal J. – DC Judge

16. Hull Barrett, PC – Counsel Defendant-Appellees Board of Regents of the University System of Georgia, Dr. Mary Arthur, Augusta University, Dr. Brooks Keel, Medical College of Georgia, and Dr. Steffen Meiler.

17. Jeffords, Tanya D., The Law Offices of Tanya D. Jeffords and Associates, PC – Counsel for Plaintiff-Appellant Dr. Lesley Williams

18. Keel, Dr. Brooks – Defendant-Appellee

19. Medical College of Georgia

20. Meiler, Dr. Steffen – Defendant-Appellee

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
DR. LESLEY WILLIAMS v. BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA, *et al.,*
*APPELLANT'S CERTIFICATE OF INTERESTED PERSONS (Continued)*
**23-12878**

21. Health System, Augusta University Hospital, Augusta University Medical

    Center, and Dr. Phillip Coule

22. Ratley, Kenneth Shavar, The Law Offices of Tanya D. Jeffords and Associates,

    PC – Counsel for Plaintiff-Appellant Dr. Lesley Williams

23. State of Georgia

24. Stoff, Katherine Powers – Office of Attorney General, Counsel Defendant-

    Appellees, Board of Regents of the University System of Georgia, Dr. Mary

    Arthur, Augusta University, Dr. Brooks Keel, Medical College of Georgia, and

    Dr. Steffen Meiler

25. The Law Offices of Tanya D. Jeffords and Associates, PC – Counsel for

    Plaintiff-Appellant Dr. Lesley Williams

26. Threlkeld, Robert Charles, Morris, Manning, & Martin, LLP – Counsel for

    Defendant-Appellees Augusta University Health System, Augusta University

    Hospital, Augusta University Medical Center, and Dr. Phillip Coule

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**
DR. LESLEY WILLIAMS v. BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA, *et al.,*
*APPELLANT'S CERTIFICATE OF INTERESTED PERSONS (Continued)*
**23-12878**

27. Webb, Bryan K., Office of Attorney General – Counsel Defendant-Appellees,
Board of Regents of the University System of Georgia, Dr. Mary Arthur,
Augusta University, Dr. Brooks Keel, Medical College of Georgia, and Dr.
Steffen Meiler

28. Williams, Dr. Lesley M. – Plaintiff-Appellant

29. Wright, Hon. Ashley – State of Georgia Superior Court Judge

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument. The events of this case took place over the course of more than one year and it involves multiple claims, multiple defendants, multiple comparators, and multiple assignments of error to be determined by the Court. Plaintiff-Appellant believes oral argument would facilitate deciding this case.

## SUMMARY OF THE CASE

Dr. Williams was a medical resident in the anesthesiology department at the Medical College of Georgia at Augusta University. After being raped and treated at Augusta University Hospital, Dr. Williams notified her supervisors, Dr. Meiler and Dr. Arthur, and requested the reasonable accommodation of taking her rotations out of the scheduled order so that she could avoid treating patients until she was ready. Dr. Williams experienced PTSD symptoms, such as difficulty sleeping and concentrating, for which she was under the care of Dr. Amy House, who was also employed by Augusta University. Instead of considering her accommodation request, Drs. Meiler and Arthur required Dr. Williams to undergo a fitness for duty test, which was conducted by Dr. Jeremy Hertza. Dr. Hertza found that Dr. Williams could be reintroduced to treating patients with certain reasonable accommodations in place. Drs. Arthur and Meiler refused to consider the accommodations recommended by Dr. Hertza and instead asked him to subject her to additional fitness for duty testing. The second test was a "simulation" where she was performed scripted scenarios in a staged operating room. She passed that test as well. Prior to the second fitness for duty test, Dr. House concluded that Dr. Williams's PTSD symptoms were "subclinical" and recommended that her department allow her to fully return to her residency, but the department refused. Dr. Williams was aware of male residents  who experienced psychological

breakdowns in the operating room and substance abuse who were not subjected to the same requirements to continue or resume their residency studies. In addition, Dr. Arthur required Dr. Williams to delete case logs for work that she performed. In light of the foregoing, Dr. Williams hired an attorney who wrote a letter to her department alleging discrimination and demanding her reinstatement, reported the deletion of her case longs to ACGME, and filed a formal claim of gender and disability discrimination with AU's Office of Employment Equity. Dr. Williams was reinstated following the second fitness for duty test and shortly thereafter was accused of cheating on an exam. The day before she was accused of cheating, an ACGME representative reached out to AU concerning Dr. Williams's complaint. Approximately three weeks later, Dr. Meiler sent Dr. Williams a termination letter which referenced her right to appeal his decision to terminate her. Dr. Williams appealed the termination, and a hearing took place in front of an ad hoc committee. The ad hoc committee recommended her reinstatement to Dean Hess who followed their commendation and reinstated Dr. Williams. Dr. Arthur told Dr. Williams the department was going to appeal Dean Hess's decision. Upon learning that there was no such appeal process, Dr. Arthur and Dr. Meiler contacted Dr. Coule, and asked him to terminate her hospital privileges to circumvent her reinstatement following the due process hearing and so that Dean Hess would have no choice but to terminate her residency. Dr. Arthur and Dr. Meiler sent Dr. Coule a letter

containing largely false allegations of misconduct by Dr. Williams. Ultimately Dr. Coule terminated her privileges and Dean Hess terminated her residency. Consequently, Dr. Williams brought claims of gender discrimination under Title IX and § 1983, disability discrimination under the ADA and § 504 of the Rehabilitation Act, retaliation under Title IX, the ADA, § 504 of the Rehabilitation Act, and Georgia's Whistleblower Act, and state law claims for defamation and breach of contract. The DC dismissed some of Dr. Williams's claims upon Appellees' pre-answer motions to dismiss and the remainder upon their motions for summary judgment.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................i

SUMMARY OF THE CASE ...............................................................................i

TABLE OF CONTENTS .................................................................................iv

TABLE OF AUTHORITIES.............................................................................v

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUES ......................................................................2

STATEMENT OF THE CASE ..........................................................................4

SUMMARY OF THE ARGUMENT ................................................................17

ARGUMENT ...................................................................................................19

CONCLUSION ................................................................................................54

CERTIFICATE OF SERVICE .......................................................................56

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)

*Bickerstaff v. Vassar College*,

    96 F.3d 435, 448 (2d Cir. 1999)

*Bostock v. Clayton County,* 140 S. Ct. 1731 (202).

*Brooks v. County Comm'n of Jefferson County*,

    446 F.3d 1160, 1163 (11th Cir. 2006)

*Brown v. Alabama Dep't of Transp.*,

    597 F.3d 1160, 1182 (11th Cir. 2010)

*Burke-Fowler*,

    447 F.3d 1319 (11th Cir. 2006)

*Celotex Corp. v. Catrett*,

    477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)

*Dixon v. Alabama State Board of Education*

*Fulmer v. PCH Hotels & Resorts, Inc.,* 2

    020 U.S. Dist. LEXIS 69223, 25-27 (N.D. Ala. Apr. 20, 2020)

*Godwin v. WellStar Health Sys.,*

    615 Fed. App'x. 518, 528 (11th Cir. 2015)

*Gross-Jones v. Mercy Med.,*

    874 F. Supp 2d 1319, 1342 (S.D. Ala. 2012)

*Phillips v. Legacy Cabinet*,

    2021 U.S. Dist. LEXIS 247385, *12-13

*Rojas v. Florida,*

    285 F.3d 1339, 1343(11th Cir. 2002)

*Shannon v. BellSouth Telecomm., Inc.,*

    292 F.3d 712, 716 (11th Cir. 2002)

*Silverman v. Board of Educ.*,

    637 F.3d 729, 733 (7th Cir. 2011).

*Skop v. City of Atlanta*,

    485 F.3d 1130, 1136 (11th Cir. 2007)(*quoting Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

*Smith v. Lockheed-Martin Corp.*,

    644 F.3d 1321, 1328 (11th Cir. 2011).

*Springer v. Convergys Customer Mgmt. Grp. Inc.,*

    509 F.3d 1344, 1349 (11th Cir. 2007)

*St. Mary's Honor Ctr. V. Hicks*,

    509 U.S. 502, 113 S. Ct. 2742 (1993)

*Staub v. Proctor Hosp.,*

562 U.S. 411, 420, 131 S. Ct. 1186, 1193, 179 L.Ed.2d 144, 154 (2011)

*Sutton v. Wal-Mart Stores E., LP*, 6

4 F.4th 1166, 1168 (11th Cir. 2023)

*Ziyadat v. Diamondrock Hosp. Co.,*

3 F.4th 1291, 1298, 29 Fla. L. Weekly Fed. C 30 (11th Cir. 2021)

**Statutes**

O.C.G.A. § 45-1-4(d)(3)

**Rules**

F. R. Civ. P. 8

Fed. R. Civ. P. R. 56

**Other Authorities**

## STATEMENT OF JURISDICTION

This is an appeal from a judgment of the United States DC for the Southern District of Georgia from the consolidated Order of the DC granting Summary Judgment, on motion of the Appellees herein, dismissing all of Appellant's claims. (R. 152.) The action was brought pursuant to Title IX of the Education Amendments of 1972, Title I of the Americans with Disabilities Act, Title II of the Americans with Disabilities Act, Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Equal Protection Clause of the United States Constitution and 42 U.S.C. Sec. 1983(Count 4), and the Due Process Clause of the United States Constitution and 42 U.S.C. Sec. 1983 (Count 7). Appellant also brought state law claims pursuant to Georgia's Whistleblower Act and for breach of contract. The action was originally brought in the Superior Court of Richmond County in the State of Georgia and removed to the DC upon motion by the Appellees.

Final Judgment was entered on September 29, 2022, and Appellant timely filed a Motion for Reconsideration/to Amend Judgment. (R. 152; R. 154.) The Order denying Appellant's Motion for Reconsideration/to Amend Judgment was entered on August 8, 2023. (R. 173.) This appeal was timely filed on August 31, 2023.

1

## STATEMENT OF THE ISSUES

Issue I- Whether the DC improperly applied the summary judgment standard when it held that the letter written by the Defendants to Dr. Coule to get her privileges suspended which contained references to the Plaintiff's protected activity was not direct or circumstantial evidence of discrimination or retaliation.

Issue II- Whether the DC improperly applied the summary judgment standard when it held that Plaintiff's arguments for pretext are numerous but only cited three pieces of evidence presented by the Plaintiff and construed all inferences in favor of the Defendants holding that Plaintiff offered only alternate theories but no rebuttal to the Defendants alleged non-discriminatory reasons when the record evidence shows otherwise.

Issue III- Whether the DC erred in finding that the Plaintiff failed to establish pretext because the other residents' misconduct was materially different and the fact that the comparators were allowed multiple opportunities at remediation did not support an inference of discrimination.

Issue IV- Whether the DC erred by applying the wrong pleading standard to Dr. Williams's GWA claim based on reporting a rule or law violation and by failing to

find that Dr. Williams adequately pled that she opposed a violation of rule or law by her public employer.

Issue V- Whether the DC erred in finding that Dr. Williams was owed less procedural due process than notice and a hearing prior to her termination.

Issue VI- Whether the DC erred in finding that Dr. Williams received adequate process when she had no opportunity to respond to the allegations and negative evaluations sent to Dr. Coule to have her privileges terminated.

Issue VII- Whether the court erred in finding that Dr. Williams rights under the ADA and Rehabilitation Act Were Not Violated As a Matter of Law Although the State Defendants Went Beyond the Scope of Testing and Questioning Under the ADA (Counts Nine and Twelve)

Issue VIII- Whether the DC erred in finding that despite failing to comply with House Staff Policy 13, Appellees did not breach their contract with Dr. Williams. (Count Fourteen)

## STATEMENT OF THE CASE

I. PROCEDURAL HISTORY

On June 3, 2020, Dr. Williams filed her Complaint in the Superior Court of Augusta-Richmond County in the State of Georgia and the Defendant-Appellees filed a joint notice of removal to federal court. (R. 1; R. 1-2.) On September 21, 2020, Dr. Williams filed her Amended Complaint. (R. 23.) On October 29, 2020, Defendant-Appellees Keel, Meiler, and Arthur moved for partial Judgment on the Pleadings, which the DC granted in part on or about July 7, 2021. (R. 32; R. 60.) Following discovery, the Defendant-Appellees moved for summary judgment on all of Dr. Williams's remaining claims. (R. 72, R. 79, R. 104.) On September 29, 2022, the DC granted summary judgment on all of Dr. Williams's claims. (R. 152.) Dr. Williams moved the DC to reconsider its Order granting summary judgment and her motion was denied on August 8, 2023. (R. 154; R. 173.) On August 31, 2023, Dr. Williams filed her Notice of Appeal.

## II. STATEMENT OF THE FACTS[1]

## A. Introduction[2, 3]

Beginning on July 1, 2017, Dr. Lesley Williams was a second-year anesthesia resident working in the GME Residency Program at the Medical College of Georgia of Augusta University ("AU"). (R. 23 at ¶ 25.) Her Resident Milestone Evaluations for the period ending June 15, 2018, show that she was meeting the goals of her program with favorable comments in all areas including Patient Safety and Quality Improvement. (R. 132-1.) Unfortunately, her whole life changed when, on March 15, 2018, Dr. Williams was sexually assaulted. (R. 23 at ¶ 45; R. 130-1 - Pl. Depo. Day 1 at 66; R. 130-2.) As a result of her sexual assault, Dr. Williams was diagnosed with Post Traumatic Stress Disorder ("PTSD"). (R. 130-3; R. 130-4.) The assault caused her to have difficulties with sleeping and concentration. (R. 130-3; R. 130-4.) Dr. Williams was assigned a Title IX coordinator Michelle Reed. She immediately began treatment with Dr. Amy House, a Ph.D. Clinical Psychologist

---

[1] The Order granting summary judgment begins by noting, "The facts of this case are outlined in the Court's July 7,2021 Order granting several Defendants' motion for partial judgment on the pleadings." (R. 152 at 2). The facts as outlined pre-discovery did not include evidence Dr. Williams obtained during discovery and offered to prove the elements of her various claims. Notably, the court did not address several items of evidence offered to prove causation and pretext in support of Dr. Williams's discrimination and retaliation claims.

[2] At mediation, Dr. Williams reached a settlement with Appellees Dr. Coule, AUMC, and AUHS. Upon execution specific agreement terms, Dr. Williams intends to move to dismiss those parties from this appeal. Nevertheless, Dr. Williams has alleged that Dr. Coule either worked as a knowing conspirator or the remaining Appellees or as their unwitting cat's paw. For this reason and based on the DC consolidating the parties and issues in its Order granting summary judgment, many of the facts and arguments herein necessarily reference Dr. Coule's actions.

[3] The DC's Order granting summary judgment begins by noting, "The facts of this case are outlined in the Court's July 7, 2021 Order granting several Defendants' motion for partial judgment on the pleadings." (R. 152 at 2.) The facts as outlined pre-discovery did not include evidence Dr. Williams obtained during discovery and relied upon by Dr. Williams in opposing summary judgment. Importantly, much of this evidence was not addressed in the Order. (R. 152, *passim.*)

who was employed at AU since 1997. (R. 132-2 at 10-13.) Dr. House met with the Dr. Williams about once a week as part of Dr. Williams's psychological therapy. (R. 130-3; R. 130-4.) On March 20, 2018, Dr. Williams returned to the residency program. (R. 130-3; R. 130-4.) Dr. House recommended that Dr. Williams return to her residency duties because the best recovery outcomes after traumatic events are usually facilitated by a return to normal work and life activities as quickly as possible. (R. 130-3; R. 130-4.)

**B. Dr. Williams's Requests For Accommodations So She Could Return To Patient Care**

Dr. House also recommended that the residency program accommodate her with some elective rotations out of usual sequence to maximize her recovery and allow her to continue with her training. (R. 130-3.) Dr. House explained that Dr. Williams reported to her the issues she was having as a result of the sexual assault and that Dr. Williams felt that she should not engage in patient care at that time. (R. 130-2; R. 132-2 at 18.) On March 27, 2018, Dr. House recommended that the Department accommodate Dr. Williams, "perhaps with some elective rotations out of the usual sequence." (R. 130-3.) Dr. Williams began to have "research" rotation during April of 2018. (Doc. 106 at ¶ 40-45.)

Subsequently, despite Dr. Williams and Dr. House representing that Dr. Williams was ready to transition back into patient care with the typical level of supervision provided to residents, the department wanted a second opinion. (Doc.

106 at ¶ 40-45.) On or about April 20, 2018, over a month later, Dr. House informed Drs. Arthur and Meiler that they should communicate with HR with regard to reasonable accommodations in the workplace for Dr. Williams because she was able to engage in "supervised patient care." (R. 132-3.) Dr. Williams requested to return to "supervised patient care" based upon her own self-assessment which Dr. House agreed was reasonable and likely accurate. (R. 132-3.) Dr. House testified that as Dr. Williams progressed in her therapy and her PTSD symptoms improve, she was more likely to be able to attend and focus and concentrate and return to full work duties, the symptoms of PTSD were less likely to get in the way. (R. 132-2 at 23.) It was possible to have some symptoms of PTSD being addressed in therapy related to trauma or PTSD and nonetheless be able to return to full work capacity. (R. 132-2 at 24.)

AU's Fitness for Duty Policy stated that when the supervisor has reliable information of the need for a fitness for duty evaluation ("FFDT"), the supervisor will contact Human Resources, Associate Vice President University HR Services, or Vice President of Human Resources for guidance on how to proceed. The Supervisor completes the Fitness for Duty Request Form which will include a behavioral or physical description of the circumstances leading to request for the evaluation. (R. 130-9.) On May 15, 2018, without having completed a Fitness for Duty Request Form, Dr. Arthur sent an email to Dr. Hertza formally requesting a

Physician Back to Work Evaluation for Dr. Williams stating, "Dr. House had determined that she should refrain from patient care until such time that she could be evaluated." (R. 130-10.) However, Dr. House testified that this statement by Dr. Arthur was untrue because Dr. Williams is the one who determined she was not able to engage in patient care right after her sexual assault, and she was ready to support her return to work by April. (R. 132-2 at 67.) Dr. Arthur requested that Dr. Hertza answer the following questions: "1. Is she cognitively and psychologically able to perform in the high stress environment of the operating room? 2. What would be the potential impact of a tragic outcome in the operating room on Dr. William's recovery?" (R. 130-10.) There is no record that HR was involved in the determination on whether a fitness duty evaluation was required. (R. 130-9 at 4.)

In May of 2018, Dr. Williams took the FFDT, and she passed with Dr. Hertza recommending seven (7) accommodations which would allow her to return to work: 1) extra time to complete tasks; 2) frequents breaks; 3) slow transition into a high stress work environment; 4) avoid serial days on call with little sleep/high stress; 5) provide her with contact to reach out to if stress or PTSD symptoms arise; 6) frequent meetings with supervisors. (R. 130-13; R. 106 at ¶121.) On July 26, 2018, Drs. Arthur and Meiler and others met to discuss Dr. Hertza's report and recommendations. (R. 130-9, p. 3.) At that meeting, without Dr. Williams present, Dr. Arthur decided that "the department would be unable to grant the requested

accommodations because of the nature of anesthesiology." (R. 130-9, p. 3.) Dr. Meiler and Arthur determined they would continue to postpone consideration of Dr. Williams' request for reasonable accommodation and recommendations of their own consultant; instead, they required a second fit for duty test, a "Simulation Evaluation." (R. 130-36.) Greg Bryan, attorney for Augusta University stated, "If she is determined to be unfit for duty, any discussion of accommodation will be unnecessary." (R. 130-36.) Approximately 2 weeks later, on August 9, 2018, Dr. Arthur met with the Dr. Williams, Dr. House, and her Rape Crise Representative, to discuss Dr. Hertza's report and recommendation. (R. 132-4.) Dr. Williams again requested that she be allowed to return to work with the accommodations recommended by Dr. Hertza. (R. 132- 4.) Drs. Arthur and Meiler denied the request stating that it would be difficult to accommodate the requests on some days. (R. 132-4.)

## C. Dr. Williams Engages in Protected Activity

While she was awaiting fitness for duty test and implementation of her requested accommodation, Dr. Williams continued her pre-existing rotation schedule which include obstetrics and pediatrics rotations in May and July of 2018. (R. 130 at ¶ 21; R. 130-18 at 50-51.) Dr. Arthur intended for Dr. Williams to merely observe; however, she did not communicate that intention to Dr. Williams or her supervisors. (R. 130-18 at 50-51; R. 130-20; R. 130-21.) Consequently, Dr. Williams

9

engaged in patient care, at the direction of her supervisors, and logged the procedures she conducted for credit towards her residency requirements. (R. 130-18 at 50-51; R. 130-20; R. 130-21.) When Dr. Arthur learned that Dr. Williams was "logging cases" she directed her to delete her case logs. (R. 130 at ¶ 27-28; R. 130-18 at 12, 50-51.) Dr. Williams protested Dr. Arthur's directive but complied. (R. 130 at ¶ 27-28; R. 130-18 at 12, 50-51.) Subsequently, Dr. Williams reported the order to delete her case logs to ACGME[4] and AU's GME office. (R. 130 at ¶ 29; R. 130-18 at 13.)Dr. Williams agreed to do the simulation test, but on September 14, 2018, she had her lawyer Mike Brown send a letter to Drs. Arthur and Meiler notifying them that she felt she was being treated differently than the male residents who had drug/alcohol abuse, PTSD, and mental breakdowns but were not required to do a simulation exam and she was suspended from her program due to her sexual assault. (R. 130-32.) Mr. Brown asked them to accept Dr. Hertza's accommodation recommendations and reinstate Dr. Williams without further hoops to jump through. (R. 130-32.)

On October 1, 2018, Dr. Williams filed a gender and disability complaint with the Office of Employee Relations. (R. 130-33.) Dr. Williams voiced her complaints to Antoinette Lewis, the Employment Relations and ADA Coordinator. (R. 130-33.) She voiced her opposition to discrimination based upon her disability and gender,

---

[4] Accreditation Council for Graduate Medical Education.

retaliation, and violation of her rights by her department. (R. 130-33.) Dr. Williams felt she was being treated differently because she was raped and female noting that there was gender bias in the program and males who were suicidal and had breakdowns in the operating room or who committed vehicular homicide who did not have to do Fit For Duty tests or simulations. (R. 130-33.) Ms. Lewis forwarded Dr. Williams's Complaint to Glenn Powell, the Office of Employment Equity. (R. 130-33.) Soon thereafter, Antoinette Lewis sent a letter to Dr. Arthur advising her of the process under the ADA, which required an interactive process, and provided her with the information from Dr. House and the request for the following accommodation: Supervision and breaks as needed and, specifically, Dr. Williams requested a "10 to 15 minute break every 2-3 hours." (R. 130-34.)

On October 2, 2018, as requested, Dr. Arthur provided the ADA Coordinator with the essential functions of an Anesthesia Resident. (R. 132-5.) The essential functions were submitted to Dr. House for review as her treating physician. (R. 132-5.) Dr. Arthur was asked to accept or reject the request for an accommodation, and informed Dr. Arthur of managements rights to submit the justification for review. (R. 132-5.) Drs. Arthur and Meiler never provided a hardship justification request for their denial until Dr. Meiler's Declaration was offered at summary judgment. (R. 106 at ¶¶134-144).

In response to her request for the accommodations of supervision and interim breaks, on November 9, 2018, Glenn Powell, of the Office of Employment Equity, recommended that they "handle Dr. Williams' request for an accommodation in accordance with our regular practice under the ADA." (R. 132-6.) That is, to forward to the department the recommendation documented from Dr. Williams's physician medical certification, and give them an opportunity to consider the recommendations. (R. 132-6.) If they choose to decline the recommendations, the ADA allows them two options: 1) provide another acceptable accommodation that accomplishes the same objective or 2) provide an undue hardship justification. (R. 132-6.) Drs. Arthur and Meiler did neither. Instead, Dr. Williams was out on administrative leave, not progressing in her education for over seven months—from June of 2018 to December of 2018—when she finally took and passed the simulation exam. (R. 132-34; 130-36.) The investigation into her complaint revealed that Drs. Arthur and Meiler did not provide a written hardship justification for denying the accommodations requested. (R. 130-9 at 5.) Moreover, the investigation revealed that there was nothing to show that the two alternatives, the simulation exam or the treatment plan, would have assisted Dr. Williams in performing the essential functions of her duties. (R. 130-9 at 5.) In December of 2018, Dr. Williams returned to her residency training and patient care. (R. 130-9.)

**D. Appellees Seek Dr. Williams' Termination**

On February 23, 2019, the following day after ACGME contacted Dr. Moore regarding a complaint Dr. Williams made to them, Dr. Williams was accused of "irregular examination behavior" for having access to study materials during an examination break.  Dr. Williams disputed that her intent was to cheat on the exam. Drs. Meiler and Arthur moved to terminate her residency. (R. 130 at ¶ 59; R. 130-37.)  On March 19, 2019, Dr. Meiler sent Dr. Williams a letter informing her that the CCC recommended dismissal and he was upholding that determination. She was placed on administrative leave status pending her dismissal. (R. 130 at ¶ 61; R. 130-39.)   Dr. Williams learned in discovery that as of March 4, 2019, the Clinical Competency Committee had recommended professional remediation for the cheating allegation. (R. 130 at ¶ 60, R. 130-38.)

In accordance with AU procedures and her due process rights as a student of a State school, Dr. Williams appealed the attempt to terminate her to an Ad Hoc Committee. (R. 130 at ¶ 62.) On May 2, 2019, the Ad Hoc Committee found that termination was not warranted and recommended to Dean Hess a performance improvement plan, remediation and/or probation, stating that no plan for remediation or probation had been considered and she had evaluations that showed no professionalism concerns. (R. 130-40.)

On May 17, 2019, Dean Hess **agreed** with the Ad Hoc Committee' recommendation and he **overturned** the proposed termination and ordered Dr.

13

Williams's reinstatement with a performance improvement plan. (R. 130 at ¶ 65; R. 130-41.) Dr. Williams was scheduled to return to her residency on June 3, 2019. She sent a conciliatory email to Dr. Arthur stating that she wanted to let the past go. (R. 132-7.) Dr. Arthur did not respond directly to Dr. Williams, but indicated to others that the department intended to appeal Dean Hess's decision to reinstate her.

## E. Appellees Engage in Post-Reinstatement Violation of Procedural Due Process

On May 31, 2019, Dr. Meiler learned "of our inability to appeal based on process" Dr. Williams's reinstatement. (R. 132-8.). In an effort to circumvent Dr. William's reinstatement, Drs. Meiler and Arthur convened faculty meetings. On June 3, 2019, the handwritten meeting minutes show where they discussed Dr. Williams' protected activity as evidenced by faculty comments of threats to sue and Dr. Williams hiring lawyers and her accommodations. (R. 132-9.) Dr. Arthur solicited evaluations and patient safety issues to submit to Dr. Coule in an effort to overturn Dr. Williams's reinstatement, including having the faculty draft negative performance evaluations, which Dr. Williams only learned about after her termination. (R. 130 at ¶ 67-73, R. 130-45.)

The State Defendants conspired with Dr. Coule to suspend Dr. Williams privileges at AUMC so that she would have to be terminated despite being

reinstated.[5] Drs. Meiler and Arthur provided these evaluations along with *draft* letters to Dr. Coule which included the statement "Over the years, the Department has successfully assisted several residents who have made mistakes in their career by providing professional help and a remediation plan that works for both the residents, our patients, and our department. Dr. Williams has consistently challenged the good will of the department and many of the departments' actions to assist her. **She recently filed a formal claim of disability and gender discrimination with the University's employment Equity Office."** (*emphasis added*)(R-130 at ¶ 75; R. 130-5 - Coule Depo. Pl. Ex102A at 105.) Dr. Coule suspended Dr. Williams's hospital privileges, which in effect, overturned Dr. Williams's reinstatement by Dean Hess. (R. 130 at ¶ 76-79, 81; R. 130-51.)

Drs. Meiler and Arthur included in their June 4, 2019, letter to Dr. Coule conduct for which they claim to have "lost trust" in Dr. Williams. Dr. Williams never got an opportunity to address Dr. Coule regarding her suspension. (R. 130-1 Day 1 at 145.) After her termination, Dr. Williams first learned of the evaluations submitted to Dr. Coule, Dean Hess, and Dr. Keel by Drs. Arthur and Meiler that were created on June 3, 2019, and were negative. Specifically, the evaluators were told that

---

[5] The DC found that Dr. Coule conspired to engage in state action based upon his inconsistent testimony that he did not speak with Dean Hess before June 4, 2020, while text message sent between Drs. Meiler and Arthur showed otherwise. The text messages were produced after discovery closed and during the briefing on summary judgment. The text messages showed an agreement to deliver Plaintiff's suspension letter and termination letter as the same time. (R-152, p. 12-14).

**"please know she will not see these evaluations. . . complete by 1:00 today"** (R. 130-49.)

On June 5, 2019, Drs. Arthur and Meiler delivered two letters to Dr. Williams, one from Dr. Coule "suspending" her hospital privileges and another from Dean Hess which indicated that with her lacking hospital privileges, he had to terminate her residency. In a text message received after depositions were complete and summary judgment briefing was underway, Dr. Meiler stated to somebody "she can't appeal Dr. Coule's decision." (R. 132-10.) Dr. Arthur stated, "[Dr. Coule] didn't want to use termination in the final letter of if [sic] respect for the dean's [Hess's] earlier decision." (R. 132-10.)

## SUMMARY OF THE ARGUMENT

The DC applied an improper summary judgment standard where it failed to view the evidence in the light most favorable to Dr. Williams and draw reasonable inferences in her favor. The DC applied the nearly identical comparator standard instead of the similarly situated in all material respects standard. The DC failed to consider and misconstrued record evidence tending to prove the causation and pretext elements of Dr. Williams's discrimination and retaliation claims. The DC applied improper standards for proof of pretext and but for causation for Dr. Williams's discrimination and retaliation claims. The DC applied the improper pleading standard to Dr. Williams's Georgia Whistleblower Act claim and failed to consider that even if Dr. Williams did not alleged that she reported AU's violations to a supervisor, she did allege and it is undisputed that she opposed what she believed to be unlawful directives by Dr. Arthur, which is an alternative method of proving a GWA claim. The DC improperly found that Dr. Williams received adequate procedural due process where circumvented her reinstatement by petitioning Dr. Coule to terminate her hospital privileges to accomplish her termination from residency. The DC improperly dismissed Dr. Williams's unlawful testing claim where the department asked her unlawful questions as part of her fitness for duty testing and subjected her to multiple fitness for duty tests. The DC improperly dismissed Dr. Williams's failure to accommodate claim where

17

the department refused to consider and implement her requested accommodations without establishing an undue hardship. The DC improperly found that Appellees did not breach the contract with Dr. Williams because it provided her with adequate procedural due process.

## ARGUMENT

### A. Standard of Review and Summary Judgment Standard

This Court reviews a DC's decision on summary judgment de novo and draws all reasonable inferences in the nonmoving party's favor. *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023).

Summary judgment may be granted only where the movant shows that there is no genuine dispute as to any material fact, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. R. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A material fact is one that is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding the motion, the Court must view evidence and factual inferences available from the evidence "in the light most favorable to the [Plaintiff], and resolve all reasonable doubts about the facts in favor of the [Plaintiff]. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (*quoting Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

<u>Issue I- Whether the DC improperly applied the summary judgment standard when it held that the letter written by the Defendants to Dr. Coule to get her privileges suspended which contained references to the Plaintiff's protected activity was not direct or circumstantial evidence of discrimination or retaliation.</u>

With regard to Dr. Williams's retaliation claims—Count Two: Title IX Retaliation, Count Ten: ADA Title II Retaliation, and Count Thirteen: Rehabilitation Act Retaliation– disability retaliation under the ADA and Rehab Act—the Court noted that the parties "largely do not dispute" that Dr. Williams engaged in protected activity and that she suffered an adverse employment action but the parties dispute the elements of causation and pretext. The DC found that to argue causation, Dr. Williams offered only the letter Drs. Meiler and Arthur wrote to Dr. Coule.  The DC found that the letter was proof that Dr. Williams was treated similarly to other residents and was not direct or circumstantial evidence of discrimination.[6] (R. 152 at 43.) The DC likewise found that Dr. Williams failed to identify sufficiently similar comparators to show retaliation. (R. 152 at 43.) Lastly, the DC found that conferring about the outcome of the letter "does not create a reasonable inference that Plaintiff's protected activity caused the termination." (R. 152 at 44.)

This Court should find that when applying the summary judgment standard properly and drawing all reasonable inferences in favor of the Plaintiff, the DC

---

[6] The DC did not use the term "retaliation;" however the section title and context suggest that the Court found that the letter was insufficient to establish discrimination or retaliation.

erred in concluding that there was no evidence from which a reasonable jury could conclude that the State Defendants sent the *draft* letter and final to Dr. Coule at AUMC with discriminatory and retaliatory intent. In arguing that she proved causation, Dr. Williams cited *Shannon v. BellSouth Telecomm., Inc.,* which held, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." 292 F.3d 712, 716 (11th Cir. 2002). (R. 132 at 19.) Dr. Williams offered and cited to several pieces of evidence that showed causation by showing that the decision to terminate Dr. Williams and her protected activity "were not wholly unrelated."

First, this Court should find that the Court erred in finding that the letter could only be read in one way and that was in favor of the State Defendants having acted with pure motives completely unrebutted by Dr. Williams. (R. 132 at 20.) The sentence in the letter which the court did not discuss was that , "She recently filed a formal claim of disability and gender discrimination with the University's Employment Equity Office . . . The language, which a reasonable jury could see as evidence of intent, appears at the end of a letter that contains nothing but reasons [why] they could not trust the Plaintiff. (R. 150 at 3.) There is not just one way to prove pretext. Every case is different. Yet, when the ultimate question for the jury to decide is whether the reason the State Defendants sent the draft letter and final

letter to Dr. Coule in the first place was due to Dr. Williams engaging in protected activity, the inference from the words used in the letter could lead a reasonable juror to the conclusion that "but for" her engagement in protected activity, the letter never would have been sent and she would have been reinstated with probation like the other residents. Dr. Williams further argued that a reasonable jury could conclude that unlike other residents, Dr. Williams "challenged the goodwill of the department" by filing claims of discrimination and that is why they petitioned Dr. Coule to suspend her privileges. (R. 150 at 4.) In fact, Dr. Arthur's deposition testimony confirms Dr. Williams's belief that her filing of the formal discrimination complaint was one way she challenged the goodwill of the department:

> Q:    But why would you tell Dr. Coule about a private complaint of discrimination based upon sex and ADA violations? Why would you tell Dr. Coule that . . .
> A:    Sometimes you need to give examples to clarify a statement that you're making and unfortunately that you know, in hindsight that should not that shouldn't have been the example chosen with.

(R. 132-11 at 144:2-10). A jury could find that the protected activity and the adverse actions taken by the State Defendants were not wholly unrelated.

This Court should find that contrary to the court's Order, the record shows that the letter to Dr. Coule and Dr. Williams comparator evidence were not the only evidence and argument Dr. Williams offered to show causation. Dr. Williams

also offered meeting notes from the June 3, 2018 meeting where Drs. Meiler and Arthur asked faculty to draft evaluations to give to Dr. Coule in support of her termination.[7] Those notes show that Dr. Williams' protected activity was not wholly unrelated from the adverse actions in this case. First, when viewing the meeting notes in the light most favorable to the Plaintiff, Dean Hess, who had ordered that Dr. Williams be reinstated, attended the meeting and questioned why [two weeks after he ordered her reinstatement] there was no plan [to reinstate her]. (R. 132 at 41 *citing* R. 132-9 at 2.) Dr. Meiler indicated that Dr. Williams had irreparably damaged professional relationships with faculty and residents. Id. This portion of the notes alone, shows that the decision to terminate her included considerations beyond her alleged misconduct. The notes included Dr. Moore expressing that she approached the process combatively, that Dr. Munoz was concerned with allowing her to work knowing she had PTSD, that Dr. Diaz questioned how she was allowed to return given her threats to sue, and Dr. Pak expressed concerns about her calling lawyers. (R. 132 at 41 *citing* R. 132-9 *passim.*) These notes show, as Dr. Williams argued, that the decision to write the letter to Dr. Coule so that he could suspend her privileges which would result in her termination was not wholly unrelated from her approaching the process combatively, threatening to sue, and calling lawyers. A reasonable jury could

---

[7] The DC did not address this evidence in its Order.

conclude that the meeting notes are evidence that the State Defendants and others in the department viewed Dr. Williams's protected activity not as a lawful exercise of her right to oppose actual or perceived discrimination but as a challenge to their "goodwill" and cause to get rid of her.

In opposing summary judgment, Dr. Williams also offered statements made by Dr. Meiler and Dr. Arthur when they gave her the termination letters evidence of causation. (R. 132 at 42.). Like the aforementioned meeting notes, the DC did not address this evidence in its Order. (R. 152, *passim*.) Dr. Williams made an audio recording of the meeting, and from listening the full recording alone, a reasonable juror could conclude that Dr. Williams's protected activity and her termination were not wholly unrelated. As discussed related to her comparator and pretext arguments, Dr. Meiler and Dr. Arthur claimed that Dr. Williams endangered patients (1) by leaving call without proper handoff and (2) by improperly extubating a patient. Nevertheless, during the meeting Dr. Williams asked them directly how she endangered any patient and they did not mention either leaving call or improper extubation. (R. 150 at 15 *citing* R. 112-22.) Similarly, when she asked them how she betrayed their trust, Dr. Arthur mentioned that Dr. Williams accused them of discrimination and reported that Dr. Arthur made her delete her case logs. (R. 150 at 16.) Dr. Williams included various verbatim quotations from the recording as well. Dr. Arthur said, "You were

combative along the way, you pointed fingers at us for everything we tried to do . .

. you accused us of having you taking care of patients and not giving credit for it."

(R. 150 at 16 *citing* R. 112-22 at 11:26.) Regarding the multiple fitness for duty

test which Dr. Williams complained were disability discrimination and gender

discrimination as males were not required to do the same, Dr. Meiler stated, "The

testing was to make sure that we understood your status, where you were in your

recovery . . . these were not actions to hurt you . . . but your attitude that was your

interpretation and you were fighting us every step of the way. **That was number**

**one**; you need to look at that." (R. 150 at 16 *citing* R. 112-22 at 14:51, *emphasis*

*added*.) This statement by Dr. Meiler is compelling evidence that Dr. Williams's

protected activity was not just wholly unrelated from her termination, but instead,

it was the "number one" reason for it. Dr. Williams again quoted Dr. Arthur

explaining what she meant by lack of trust:

> "I can give you another example . . . we talked about
> correcting the case logs. **You agreed, and the next thing**
> **I knew is you filed a complaint against us to the**
> **ACGME and were in the GME office, so you tell me**
> **where is the trust in this** . . . you know, when we talk to
> our residents we talk to them in good faith and **this is not**
> **a law firm, we don't cross our T's and dot our I's** . . .
> when things like that happen you cannot fault the faculty
> if they come back and say I was doing things in good faith
> . . ." (R. 150 at 16-17 *citing* R. 112-22 at 17:38, *emphasis*
> *added*.)

As Dr. Williams argued, that recording, even taken alone was a cause of her termination. (R. 150 at 17 *citing Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) ("To show causation, a plaintiff in a retaliation case need prove only that retaliatory animus was one factor in the adverse employment decision.").

In addition to the foregoing, the relative treatment of Dr. Williams compared to other residents who complained about the department and those who did not is evidence that Dr. Williams's protected activity was a but for cause of her termination. As noted above, Dr. Meiler and Dr. Arthur labeled Dr. Williams as combative because unlike other residents, she opposed the "interventions" they claim were made in good faith. One such resident was referred to as "BR" to preserve his privacy. Dr. BR had an emotional breakdown in the operating room and told his department that he was having ideations of self-harm. (R. 130-1 - Pl. Depo. Day 1 at 209:22-25, 210:4-16; Pl. Depo. Day 2 at 124:7-17.) Dr. AM had an outburst in the operating room and was cited for erratic behavior, anger management issues, and creating a hostile work environment. (R. 130-57; R. 130-58.) Dr. AM was ordered to take a drug test and suspended for two weeks. (R. 130-58.) Subsequently, Dr. AM was indicted for DUI homicide, a felony, wherein he was accused of operating a motor vehicle with a BAC exceeding the legal limit. Resident AM was allowed to take an indefinite leave of absence and return to the

program once his case was resolved. (R. 130-59; R. 130-60.) Dr. AT, lied about his criminal history, had unsatisfactory academic performance, and refused to take call. (R. 130-62; R. 130-63; R. 130-64; R. 130-65; R. 130-66.) Dr. HP was twice found to have returned morphine syringes with record keeping discrepancies and ordered to undergo for cause drug testing; the test results were positive. (R. 130-68; R. 130-70.) Dr. FM was charged with misdemeanor DUI while attending a program-related event. (R. 130-71.) Dr. R was cited for multiple incidents of unprofessional behavior, disruptive behavior, lack of respect for coworkers and jeopardizing patient safety, which included ignoring a patient's pleas of being in pain and giving patients large dosages of potent narcotics without a medical need. (R. 130-73.) All of the foregoing were male residents in the anesthesiology department, all of them had Dr. Arthur and Dr. Meiler as supervisors, all of them were subject to the same policies and procedures and that actually committed misconduct similar to what Dr. Williams was falsely accused of.

They have three other things in common. None of them were required to submit to fitness for duty testing; Dr. Meiler and Dr. Arthur did not petition Dr. Coule to terminate their privileges based on them being a threat to patient safety; and none of them engaged in protected activity. While the DC found that they were not sufficiently similar to be considered comparators, even if that is the case, the foregoing is circumstantial evidence that Dr. Williams was treated differently

because she did engage in protected activity. This is especially true considering how the department treated Dr. TS. He was also a resident in the department and was diagnosed with narcolepsy. Despite exhibiting no behavior threatening to patients, the department subjected him to what he believed were discriminatory requirements, and when he complained, the department did not renew his residency contract. Every resident who had academic difficulty or engaged in misconduct that did not engage in protected activity was given, often multiple, opportunities for remediation, yet the two residents who complained of discriminatory treatment due to their actual or perceived disabilities was removed from the program. This track record by the department deserved to be heard and weighed by a jury, not summarily dismissed as a matter of law.

The DC found that (1) conferring about the outcome of the letter "does not create a reasonable inference that Plaintiff's protected activity caused the termination;" (2) and (3) that Dr. Williams claimed lack of credibility did not rebut the proffered reason, it merely offered an alternative theory; (4) that Dr. Meiler's opinion that probation was appropriate "does not create a reasonable inference that Plaintiff's protected activity was the cause of her termination;" and (5) that the uncited evidence of cherry-picking did not rebut the proffered reasons. (R. 152 at 44-45.)

The DC identified the following as Dr. Williams's evidence and arguments for pretext: (1) that Dr. Arthur, Dr. Meiler, and Dean Hess conferred about the outcome of the act of "sending the letter summarizing their concerns about patient safety" to Dr. Coule; (2) that the allegations of patient safety lacked credibility; (3) that the evaluations were not the real reason for her termination; (4) that Dr. Meiler opined that probation, not termination, was the correct intervention; and (5) "without citing any evidence" she argues that her reviews were average or above average and that Drs. Arthur and Meiler cherrypicked a few negative comments and removed all positive commentary from her evaluations. (R. 152 at 44-45.).

<u>Issue II- Whether the DC improperly applied the summary judgment standard when it held that Plaintiff's arguments for pretext are numerous but only cited three pieces of evidence presented by the Plaintiff and construed all inferences in favor of the Defendants holding that Plaintiff offered only alternate theories but no rebuttal to the Defendants alleged non-discriminatory reasons when the record evidence shows otherwise.</u>

Pursuant to Title IX, the ADA, and Section 504 of the Rehabilitation Act, Dr. Williams brough claims for sex discrimination, disability discrimination, and retaliation against the Institutional Defendant-Appellees: Board of Regents of the University System of Georgia, Augusta University Medical Center, Inc., and Augusta University Medical System, Inc. Likewise, pursuant to Section 1983, Dr. Williams brought equal protection sex discrimination claims against Dr. Meiler, Dr. Arthur, Dr. Coule, and Dr. Keel in their individual capacities. Lastly, Dr. Williams asserted a state law retaliation claim against the Institutional Defendant-

Appellees for violating Georgia's Whistleblower Act. Each of these claims may be analyzed under the Title VII framework and may be proven by direct evidence, by a convincing mosaic of circumstantial evidence, or by circumstantial evidence offered in satisfaction of the McDonnell Douglass burden shifting framework. Regardless of the nature of the evidence offered or analytical framework used, the ultimate question is always "did the employer intentionally discriminate [or retaliate] against the employee?" *See, e.g. Fulmer v. PCH Hotels & Resorts, Inc.,* 2020 U.S. Dist. LEXIS 69223, 25-27 (N.D. Ala. Apr. 20, 2020). The DC concluded that Dr. Williams failed to prove intentional discrimination because she did not offer any direct evidence of discrimination or retaliation and because assuming arguendo that she established a prima facie case, she failed to establish each of the employers' proffered reasons for her termination was pretext. (R. 152, at 19, 35, 40.) Nevertheless, Dr. Williams offered several pieces of compelling evidence that unlawful discrimination or retaliation motivated, at least in part, her former employers' actions. Dr. Williams argued that while she believed the record sufficiently called into doubt her employers' proffered motivations, proving pretext by refuting each proffered reason was unnecessary because she offered evidence more than sufficient to establish that even if her employers also had lawful motives, the proof she offered of their unlawful motives was sufficient to prove that discrimination and retaliation were "but for" causes of her termination.

Therefore, summary judgment should have been denied and the evidence should be weighed by a jury.

The DC relied on Gross-Jones for the proposition that "in the Eleventh Circuit, 'a reason is not pretext unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" (R. 152, at p. 20 *citing Gross-Jones v. Mercy Med.,* 874 F. Supp 2d 1319, 1342 (S.D. Ala. 2012)). As the DC noted, *Gross-Jones* was citing *Springer v. Convergys Customer Mgmt. Grp. Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007). For the same proposition, the *Springer* Court cited *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) which was quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 113 S. Ct. 2742 (1993). It is there in *St. Mary's* that we find the original holding that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.* at 515. While it is undeniable that plaintiff-employees were once required to prove *both* that the employer's asserted reason was false and discrimination was the "real" reason, that requirement contradicts subsequent Supreme Court jurisprudence, and therefore, is no longer valid.

The Supreme Court's holding in *Bostock v. Clayton County* relieved plaintiffs of the disprove-all-reasons burden it previously imposed upon plaintiffs in *St. Mary's*. 140 S. Ct. 1731 (2020). *Bostock* held that discrimination is

actionable where an employer has multiple motivations, some lawful and some unlawful, so long as a single discriminatory motive is a "but for" cause for the adverse employment action. Post *Bostock* an employee must only show that the adverse action was based in part on unlawful discrimination and is not required to show, as was suggested under *St. Mary's*, that the employee must prove that unlawful discrimination was the primary or only reason for the adverse action. In *Bostock*, the Court did not merely acknowledge the possibility of multiple, possibly independent, "but for" causes for an action, it emphasized that nearly all human actions have multiple "but for" causes and that an employer violates the law if one "but for" cause for an employer's action is discriminatory no matter how many other lawful reasons the employer may put forth. In fact, the Court stated no less than thirty-five times that "but for" cause does not mean single cause; however, a single discriminatory "but for" cause is sufficient for a plaintiff to survive summary judgment.[8] Examples include, "Often events have multiple but-for causes;" if unlawful discrimination "was one but-for cause…that is enough to trigger" Title VII; protected status need not be "the sole…cause;" protected status also need not be the "primary cause…or main cause" of the employer's action." *Bostock* at 1739, 1744. Most importantly, under *Bostock*, "It doesn't matter if other factors besides [unlawful discrimination] contributed to the decision." Id. at 1741.

---

[8] *See* 43 Cardozo L. Rev. 1807, 1835 for a listing with citations of each.

Dr. Williams does not concede, as the DC held, that she failed to sufficiently disprove the proffered lawful reasons for her termination. In fact, she did so in many ways, and none of them were conclusory denials or mere quibbling with the employer's decision. Dr. Williams showed that male residents in her department who had not engaged in protected activity but who did engage is the same type of alleged misconduct or even worse misconduct, were not terminated by their department or reported to Dr. Coule as a threat to patient safety so that he may terminate them. (R. 130, at ¶ 90-93, 95, R. 130-63, R. 130-64, R. 130-65, R. 130-66); (R. 130, at ¶ 99; R. 130-73). Dr. Williams showed that the Clinical Competency Committee, which was tasked with recommending discipline for Dr. Williams initially intended to recommend probation but changed its recommendation after being informed of Dr. Meiler's desire to terminate her. (R. 132-13 - Feb - Mar Meeting Mins and warning; R. 130-39 - 3.19.19 Meiler Termination Letter; R. 130-18 - Grievance Hearing Transcript.) Dr. Williams showed that after Dr. Meiler chose to terminate Dr. Williams, an Ad Hoc committee reviewed the allegations against Dr. Williams and recommended that she be given clearer directives and an opportunity for remediation. (R. 136-11). Dr. Williams showed that Dean Hess reviewed the proceedings before the Ad Hoc committee and its recommendations, and agreed that probation and reinstatement was appropriate. (R. 130, at ¶ 63-65; R. 130-40). Dr. Williams showed that at least

33

one of her supervising physicians testified that her alleged mistakes were actually typical of residents in a learning environment and those mistakes are to be addressed via remediation and not punishment. (R. 130, at ¶ 101, R. 130-74 at 43-44.) Dr. Williams showed that all of her evaluations were average or above average, except for evaluations drafted the day before her termination which covered the same time period for which she had already received contradictory successful evaluations.[9] (R. 136-11); (R. 130, at ¶ 63-65; R. 130-40); (R. 112-47). Dr. Williams showed that after her reinstatement, even Dr. Meiler stated that probation was appropriate. (R. 152, at 44-45). Importantly, the employers claimed no individual proffered reason for her termination was sufficient on its own for termination, but the totality was. Nevertheless, Dr. Williams established multiple false statements by the employers regarding their proffered reasons showing an utter lack of credibility in addition to offering evidence in directed contradiction to them.

While Dr. Williams proved both that the employer's reasons were false and offered evidence of discriminatory and retaliatory motives, under *Bostock,* she was only required to do the latter, and she did so with an overabundance of evidence. This evidence, the DC either discounted or ignored, apparently because the

---

[9] *See* Rojas v. Florida, 285 F.3d 1339, 1343(11th Cir. 2002)(*noting* that employees with good employment history suddenly receiving poor evaluations may be evidence of pretext.).

evidence of discrimination or retaliation did not prove false the employers' stated reasons. (R. 152, at 20, 30-31). That evidence included:

1.     The letter from Dr. Meiler and Dr. Arthur to Dr. Coule imploring him to terminate Dr. Williams included, "She recently filed a formal claim of disability and gender discrimination with the University's Employment Equity Office." (R. 152, at 31). The DC found that "The letter is evidence Plaintiff was treated similarly to other residents, not differently; it cannot be read as direct, or even circumstantial, evidence of discrimination." (R. 152, at 31-32). The DC concluded that the only possible reading of the letter is in favor the Defendant-Appellees. To the contrary, the plain fact that her protected activity is highlighted in Drs. Meiler and Arthur's own explanation of why they were seeking the termination of Dr. Williams is undeniably evidence of retaliation: "Over the years, the Department has successfully assisted several residents who have made mistakes in their career by providing professional help and a remediation plan that works for both the residents, our patients, and our department. Plaintiff has consistently challenged the good will of the department and many of the departments' actions to assist her. She recently filed a formal claim of disability and gender discrimination with the University's employment Equity Office." (R. 130 at ¶ 75, Ex. 5 – June 4, 2019, Draft Termination Ltr. to Coule; Coule Depo. Pl. Ex102A). A fair reading of the letter is, "we tried to help her overcome her mistakes, but she viewed our help as

35

unlawful discrimination and engaged in protected activity by filing a formal

complaint against us, which was substantiated, and but for her having complained,

we would not be seeking her termination, just as we need not seek the termination

of other residents who made mistakes but did not complain." In choosing to instead

read the letter in favor of the Defendants and conclude that was the only possible

reading, the DC invaded the province of the jury, drew inferences in favor of the

Defendants, and made credibility determinations.

2.      On June 3, 2019, Dr. Meiler and Dr. Arthur called a faculty meeting

where they requested evaluations to support a conclusion that Dr. Williams was a

threat to patient safety in order to attempt to terminate her a second time after their

first attempt was overturned. The faculty members who submitted the negative

evaluations plainly expressed unlawful motives for supporting her termination.

Those motives included her having PTSD from her rape, her hiring an attorney,

and the possibility that she may complaint or sue in the future based on her having

already engaged in protected activity. (R. 132-9.)

3.      Dr. Basta expressed that he was not concerned that Dr. Williams was

a threat to patient safety and was willing to mentor her going forward. (R. 132-9.)

4.      An audio recording where Dr. Meiler and Dr. Arthur tell Dr. Williams

she was terminated because they could not trust her. They explain that they could

not trust her because she had complained about Dr. Arthur and threatened to sue,

so they could not trust that she would not complain or sue if, in the future, she felt

they were violating her rights. . (See, R. 150, at 15 citing *Brown* at 1182 ("To show

causation, a plaintiff in a retaliation case need prove only that retaliatory animus

was one factor in the adverse employment decision.").

5.      On or about May 20, 2019, the Office of Employment Equity

("OEE") published its findings that university policy was violated by failing to

follow existing procedure for reasonable accommodations and by failing to follow

existing procedure for requesting fit for duty tests with regard to Dr. Williams. (R.

130 at ¶ 66, R. 130-9.)

6.      The DC found nothing problematic about Dr. Meiler and Dr. Arthur

soliciting negative performance reviews for the purpose of support the termination

of Dr. Williams and absolved Dr. Coule of any wrongdoing by noting they he only

viewed the negative and not the positive review of Dr. Williams created in the

normal course of business, as opposed to for the purpose of terminating her, and

covering the same time period. The DC's conclusion ignored that cherry-picking

only negative performance evaluations to show to Dr. Coule is indicative of

unlawful motives because Dr. Meiler and Dr. Arthur purposefully painted an

incomplete and biased picture of Dr. Williams' performance. In addition, the DC

ignored that sudden negative performance reviews tends to demonstrate pretext

and support an inference of discriminatory or retaliatory motives. *See Rojas v.*

*Florida*, 285 F.3d 1339, 1343(11th Cir. 2002)(noting that employees with good employment history suddenly receiving poor evaluations may be evidence of pretext.).

    7.    Dr. Coule claimed that he had no input into the contents of the letter he received from Dr. Meiler and Dr. Arthur and all three claimed that their communications were limited to a simple request for the letter and the delivery of the letter. Nevertheless, Dr. Arthur sent Dr. Coule a draft of the letter the day before sending the final letter and she informed him that she was building a case around a solitary issue. The DC focused on the fact that Dr. Coule was not physically present at the meeting where Dr. Arthur requested the negative evaluations from the faculty (R. 152 at 34.) but the evidence shows that after Dr. Coule received the draft letter, Dr. Arthur, through her assistant, asked the faculty to add comments to their evaluations and told them Dr. Williams would never see the evaluations. Dr. Arthur noted that only seven evaluations were complete, but she only provided one (1) complete evaluation to Dr. Coule along with a selected text from others.  (R. 130-5, at 101-111.) From this evidence, a reasonable jury could infer that Dr. Arthur intended to provide an incomplete and inaccurate representation of Dr. Williams, and was aided by Dr. Coule in doing so, so that they could justify her predetermined termination. Instead, the DC drew the

inference in favor of the Defendants and made credibility determinations in accepting their claimed benign motives where a jury would not be compelled to.

<u>Issue III- Whether the DC erred in finding that the Plaintiff failed to establish pretext because the other residents' misconduct was materially different and the fact that the comparators were allowed multiple opportunities at remediation did not support an inference of discrimination.</u>

Count One of Dr. Williams's cause of action alleged disparate treatment on the basis of sex in violation of Title IX for terminating her residency and issuing her a letter of warning for cussing. Dr. Williams submits that a jury could find based on the evidence presented that even if she engaged in some actions that violated the rules of professional conduct, a standard that all anesthesiology residents must abide by, probation not termination was the appropriate result for any behavior that Drs. Arthur, Meiler, and Keel felt she engaged in. The conclusion that remediation and probation were the appropriate result is evidenced by the email from Meiler, the Ad Hoc Committee's determination, Dean Hess's reinstatement, and no new conduct on Plaintiff's behalf that was not already known by Dr. Meiler and Arthur. Unlike with Dr. AT and Dr. R, who engaged in similar or worse conduct, Drs. Arthur and Meiler did not send a draft letter and revised letter, the adverse action in this case, to Dr. Coule at AUMC outlining all negative things they could find about the male anesthesiology residents so that he would suspend her privileges which would then result in her termination and she would not be reinstated with probation.

The evidence submitted in support of her theory of the case that she would not have been terminated and would have been placed on probation but for being female, disabled due to her PTSD as a result of her rape, and having engaged in protected activity by filing a claim of gender and disability discrimination is the evidence presented about the comparators professional misconduct and subsequent remediation and probation, and not termination.

The DC concluded that Dr. Williams failed to establish element (3) of the prima facia case of discrimination in that she "has not provided evidence of any proper comparators." (R. 152 at 42.) In support of its conclusion, the DC quoted *Burke-Fowler*, "the quantity and quality of the comparator's misconduct [must] be nearly identical." (R. 152 at 42.) The Plaintiff argued in her motion for reconsideration that said standard for comparators should be "similarly situated in all material respects." (R. 154.) The DC agreed that the standard cited of "nearly identical" was improper but held that it had properly applied the similarly situated in all material respects in analyzing Dr. AT and Dr. R and came to the same result that neither were proper comparators. (R-173, p. 7-8.)

However, this Court should find that even if the DC stated that it would end up with the same result under either standard, when the summary judgment standard is applied properly with all reasonable inferences drawn in favor of the Plaintiff, the comparators would be similar in all material respects and the

40

difference in treatment could support an inference of discrimination.   Dr. Williams

argued that Dr. AT and Dr. R were valid comparators for several reasons.  When

the evidence is viewed in light of the case that Dr. Williams wants to present to a

jury, Dr. Williams highlighted medical residents as opposed to other doctors or

medical students, the residents were in her same department, they were subject to

the same policies and rules, they shared the same supervisors, and they had similar,

if not worse, disciplinary histories. (R. 152 at 20).  Given the statement in the letter

to Dr. Coule that unlike other residents who have had issues the decision-makers,

Dr. Meiler and Dr. Arthur, themselves could have considered them to be similarly

situated with the exception of Dr. Williams being a woman (and having engaged in

protected activity.  When the evidence is viewed in light of the case that Dr.

Williams wants to present to a jury, Dr. Williams highlighted medical residents as

opposed to other doctors or medical students, the residents were in her same

department, they were subject to the same policies and rules, they shared the same

supervisors, and they had similar, if not worse, disciplinary histories. (R. 152 at

20.) Here, the comparators actually violated the standards of professionalism

and/or endangered patients, the same types of violations Dr. Williams was alleged

to have committed. (R. 132 at 15-17.)

     Dr. Williams was accused of: (1) endangering a patient by extubating her

without proper monitoring equipment in place, (2) violating professionalism

standards by swearing at her supervisor, (3) being dishonest by allegedly cheating on an exam, (4) consuming a THC edible, and (5) unprofessionalism for abandoning her call duties. (R. 152 at 30.) Dr. AT, one of Dr. Williams's proposed comparators was (1) dishonest for having lied about how many times he was convicted of public intoxication, (2) had unsatisfactory academic performance, and (3) was unprofessional by refusing to take call. (R. 152 at 32.) Dr. R (1) was absent without permission, (2) failed to answer pages and calls, (3) leaving work early without notifying supervisors, (4) ignored a patient's pleas due to pain such that everyone in the OR including the surgeon refused to work with Dr. R without an attending physician present, (5) gave a patient an unreasonably large dose of muscle relaxant, and (6) gave large doses of a potent long-acting narcotic to patients. (R. 152 at 33 *citing* R. 112 at 21-22.) It is important to note that Dr. R gave the patient referenced in (5) the large dose of muscle relaxant with only 10 minutes remaining in the procedure and due to the patient's age, she could not be given a second drug used to reverse the effects of the muscle relaxant after surgery. (R. 130-73 at 4.) In addition, not once but several times, Dr. R gave patients the potent and long-acting narcotic when he was relieving other residents. (R. 130-73 at 4.)[10] While it is true that not all the allegations against Dr. Williams were

---

[10] A reasonable inference may be drawn, as is suggested in R. 130-73, that Dr. R gave the patients the narcotics to incapacitate them so he would not have to deal with them and not for any legitimate medical purpose.

identical to the admitted and documented transgressions of her comparator

residents, the real question on summary judgment is whether a reasonable juror

could conclude based upon the evidence that Dr. Meiler and Arthur's decision to

commit the adverse action of sending a letter to Dr. Coule about any perceived

unprofessional behavior of Dr. Williams after she was reinstated by Dean Hess and

the failure of them to send a letter when faced with Dr. AT and Dr. R's

unprofessionalism would support an inference of discrimination and retaliation.

Accordingly, the Court should find that the DC erred and that Dr. At and Dr. R

were proper comparators and that she did make out a prima facie case of disparate

treatment in discipline.  It would be an impossible standard for any plaintiff to

meet under the analysis laid out by the DC.  The anesthesiology residents were

alike in kind and degree. According to Appellees' version of events Dr. Williams

and Dr. AT had issues with honesty, professionalism, and attendance. Similarly,

according to Appellees' version of events, Dr. Williams and Dr. R abandoned their

posts without notifying their coworkers and endangered patients. Even under the

Appellees' version of events, Dr. Williams was accused of the same basic

misconduct as Dr. AT and Dr. R. The Court, however, does not have to accept

Appellee's version of events; in fact, it is required to accept Dr. Williams's

testimony as true. See, e.g. *Phillips v. Legacy Cabinet*, 2021 U.S. Dist. LEXIS

247385, *12-13 (*internal citations omitted*)("But the court must accept Phillips'

testimony and declaration as true. That means the court must assume that Phillips was not insubordinate during the group meeting.")

Under the summary judgment standard, the DC was required to accept Dr. Williams's testimony, including her denials of Appellees' allegations as true and analyze only her undisputed (mis)conduct for comparator purposes. Considering her deposition testimony and other evidence discussed *infra* related to pretext, Dr. Williams disputes that she endangered a patient, disputes that she cheated on the exam, and disputes that abandoned call and left the pager on a desk instead of handing it to another resident. She also admits to consuming THC "several months ago" when she was on leave, which is supported by her passing a drug test and disputes Appellees' claims that THC use affected her at work. Consequently, Dr. Williams's only "true" misconduct for summary judgment and comparator purposes is swearing at her supervisors when they required her to take the drug test. This conduct is unprofessional, like the conduct of Dr. AT and Dr. R, but much less so. It is also similar to Dr. AM, referenced in her statement of facts, in that it involved the unprofessional act of swearing in the workplace. (R. 130-57; R. 130-58.) Therefore, Dr. Williams has shown multiple comparators with whom she was similarly situated in all material respects.

Moreover, to the extent Dr. Williams' propounded comparators were not similar in all material respects, the DC erred in completely disregarding the

evidentiary value of the difference in treatment between Dr. Williams and those residents in establishing a convincing mosaic of evidence proving discrimination and retaliation. To that end, the Eleventh Circuit Court of Appeals has recognized that failure to point to a comparator "does not necessarily doom the Plaintiff's case," and that a claim may survive when the Plaintiff presents "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The ultimate question is there is evidence from which a reasonable jury could conclude that Dr. Williams was treated different from her male co-residents who did not engage in protected activity provides more than a "suspicion or guess;" and contributes to a "convincing mosaic of circumstantial evidence that would allow a jury to infer" that had Dr. Williams been male or had she not filed a formal complaint of sex and disability discrimination, she would have been allowed an opportunity for remediation instead of being terminated, just like the male residents who actually engaged in worse misconduct. 644 F.3d at 1328, *quoting Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999); *Silverman v. Board of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011).

<u>Issue IV- Whether the DC erred by applying the wrong pleading standard to Dr. Williams's GWA claim based on reporting a rule or law violation and by failing to find that Dr. Williams adequately pled that she opposed a violation of rule or law by her public employer</u>

45

The DC  held, "Without an allegation in her complaint that she reported a violation to a direct supervisor, the State Defendants are entitled to judgment on Plaintiff's GWA claim as a matter of law. . (R. 152 at 47.) This ruling is improper for two reasons. First, Dr. Williams reported the violations to Dr. Moore, who was a direct supervisor and as the Designated Institutional Offices, was the person designated by AU to receive complaints such as Plaintiff's. (R. 132 at 43-46.) Moreover, Plaintiff was not required to plead specifically that she made the report to Dr. Moore and the court's requirement that she do so overstates the specificity required in pleading and is legal error. F. R. Civ. P. 8.

Second, even if Dr. Williams' pleading that she "reported" violations was insufficient for not specifying a supervisor, a plaintiff may also engage in protected activity by "objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation." O.C.G.A. § 45-1-4(d)(3). Dr. Williams plead that she objected to and refused to participate in what she believed was unlawful activity regarding the deletion and submission of her case logs. (R. 23 at ¶ 15, 61, 67, 68). Therefore, dismissing her GWA claim was improper. This Court should find that there is sufficient evidence from which a jury could conclude that Dr. William's complaints about having to delete her logs was another reason the State Defendants could not trust her and

46

were a factor in seeking and obtaining her termination after she was reinstated with probation.

Issue V- Whether the DC erred in finding that Dr. Williams was owed less procedural due process than notice and a hearing prior to her termination.

Fifty years ago in *Dixon v. Alabama State Board of Education*, the court said, "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Dixon*, 294 F.2d at 157. The DC found that the State Defendants did not have to provide Plaintiff with elaborate pre termination proceedings, and she received all the process she was due which is contrary to Supreme Court precedent. (R. 152, p. 51.) The finding that Plaintiff received all the process she was due appears to also be premised on the Court's belief that Dr. Coule, AUMC and the State Defendants were not aware that suspension of her privileges would implicate her due process rights. Yet, the Court found that Dr. Coule could be considered a State actor for having conspired with the State Defendants. What did Dr. Coule conspire to do? A reasonable jury could find that they conspired to get Dr. Williams terminated from her residency at a State school by getting Dr. Coule, at a private entity, to take an adverse action against her. Moreover, the email from counsel Mr. Melcher for AU on March 19, 2019, to Dr. Coule proves that they were aware that Dr. Williams was due further due process as the email stated that "AUMC and GME have exclusive authority over credentials and privileges for residents, if those are withdrawn then AU will

47

terminate the resident as an employee." A reasonable jury could find this is the essence of the conspiracy. . . USG has clarified for us in the past that residents must be afforded two separate appeal rights if they are dismissed or terminated - an academic appeal and an employment appeal. (R. 154-1.) Dr. Coule and the State Defendants were aware that AU would have to terminate a resident if privileges are withdrawn. To decide as a matter of law that Dr. Williams received all the process which she was due as it is related to the suspension of her privileges and termination from her residency when she received both the suspension and termination at the same time and she did not receive the June 4, 2019 letter or the evaluations prior to the suspension or termination, or before she appealed to Dr. Keel is error. The Court assigned no weight to the fact that the suspension of privileges was designed to circumvent the due process right where she had already won the appeal of her termination. This Court should find that not only did Dr. Williams not receive due process, but the State Defendants acting in concert with Dr. Coule worked to take away her due process right to reinstatement after her grievance was successful (R. 80, at 19.) Plaintiff had a property interest and due process under established constitutional law.

Issue VI - Whether the DC erred in finding that Dr. Williams received adequate process when she had no opportunity to respond to the allegations and negative evaluations sent to Dr. Coule to have her privileges terminated

The DC did not discuss that the Plaintiff was reinstated because of her due process right to be terminated for "just cause" after all the conduct that the Appellees claim was their legitimate, non-legitimate reason for suspending her privileges had occurred. The court's reliance on the May 17, 2019, letter as some sort of warning is not consistent with the facts. A jury could find that when the State Defendants realized she had won her appeal, they formulated this scheme with Dr. Coule to have him "suspend her privileges" so that she would be terminated anyway. This email which Dr. Coule, AUMC or the State Defendants failed to produce is indicative of their discriminatory motives. This evidence further supports the inference that Defendants Coule, Meiler, Arthur and Dean Hess spoke about the lack of appeal rights they had when the Plaintiff was reinstated, and that suspension of her privileges was the way to go. Only by drawing all inferences in favor of Defendants may one find as a matter of law that based upon this record no juror could conclude that the reason Dr. Meiler and Dr. Arthur wrote the draft letter and then final letter and sent them to Dr. Coule, requested additional evaluations and had a meeting where they discussed her suing, her disability and trusting her, had nothing to do with her "recent filing of a formal claim of disability and gender discrimination."

The DC found, "at the time Plaintiff was reinstated on May 17, she received a letter that provided '[t]here will be zero tolerance for any unprofessional

behavior' and '[a]ny future problems with [her] performance or behavior will result in further action up to and including termination.' (R. 105-26, at 8.) This letter was sufficient to notify Plaintiff that she could still be terminated following her reinstatement." (R. 152, at 50-51). The Court takes this letter out of context of the case. The letter sent on May 17, 2019 cannot be notice sufficient to satisfy due process requirements as there was no "**future**" behavior.  Plaintiff appealed her termination by Dr. Arthur and Meiler, she won, was reinstated, and she never returned to work between the May 17, 2019 letter because then Dr. Coule "suspended her privileges" and she was terminated June 5, 2019. This circumvention of her due process right to appeal is evidence of pretext.

Issue VII- Whether the court erred in finding that Dr. Williams rights under the ADA and Rehabilitation Act Were Not Violated As a Matter of Law Although the State Defendants Went Beyond the Scope of Testing an Questioning Under the ADA (Counts Nine and Twelve)

In dismissing Dr. Williams's claim for unlawful testing, the DC concluded that Dr. Williams failed to prove that the questions and/or testing performed by Lifeguard and Dr. Hertza did not go beyond the permissible scope work related questions allowed under the ADA and Rehabilitation Act. (R. 152 at 53-56.) The court noted a specific question regarding the impact a tragic outcome in the operating room would have in the operating room was highlighted by Dr. Williams as an example of questions she alleged were impermissible. (R. 152 at 54.) The court found, however, that Dr. Meiler withdrew the question before it was asked of

Dr. Williams and that to the extent that question was asked or another impermissible inquiry was made by Lifeguard, Dr. Williams could offer no evidence that any of the Appellees requested that the question be asked. (R. 152 at 55-56.)

Despite the foregoing, the summary judgment standard requires an inference in Dr. Williams's favor that the impermissible questioned asked of Dr. Williams were directed by Appellees based on the following. First, Dr. House admonished Dr. Meiler and Dr. Arthur to include HR and the legal department in the FFDT and accommodations process and noted that she believed they may be out of compliance with the law. (See, e.g. R. 105-15 at 147.) Nevertheless, AU's own investigation determined that Dr. Meiler and Dr. Arthur violated university policy regarding fitness for duty testing and reasonable accommodations. (R. 130-9 at 5.) In the least, this shows the department was not concerned with complying with university policies and the laws they were designed to comply with. Second, Appellees do not dispute that Dr. Williams was asked the questioned she deemed impermissible, but instead state "it is not immediately clear that these questions had no bearing on her ability to perform her duties. More important, there is no evidence that any agent of the BOR asked Lifeguard to question Plaintiff on these topics." (R. 143 at 13.) Where the department had a track record of making an impermissible inquiry, the department disregards its own processes to ensure

51

compliance with relevant policies and laws, and impermissible questions are actually asked, a reasonable inference may be made that the department asked for and intended such inquiries. Nevertheless, an agent of BOR did direct Lifeguard to question Plaintiff on impermissible topics. Dr. Hertza noted in his report that he is an "Associate Professor of Neurology & Psychiatry at the Medical College of Georgia at Augusta University, Georgia." (R. 130-13 at 5.) Undoubtedly, Appellees will claim that Dr. Hertza was acting a different capacity; however, a jury is not required to believe that "Drs. Meiler and Arthur decided to request an independent, objective evaluation of Plaintiff's ability . . ." when the person performing that evaluation is their coworker nor is it required to believe that Dr. Hertza is even capable of such independence.

Lastly, and most importantly, Dr. Williams also argued that requiring the second "simulation" exam was impermissible. (R. 132 at 31.) The first fitness for duty test performed by Dr. Hertza included a clinical interview, neurobehavioral examination, record review, the Beck Depression Inventory, Beck Anxiety Inventory, Boston Naming Test, Conner's Continuous Performance Test, California Verbal Learning Test, CLOX: An Executive Drawing Test, Controlled Oral Word Association Test, Judgment of Line Orientation, Personality Assessment Inventory, Test of Premorbid Functioning, Test of Memory Malingering, Trail making Test Part A/B, Verbal Reasoning Cognitive

52

Competency Test, Wechsler Adult Intelligence Scales, Wechsler Memory Scales, Wisconsin Card Sorting Test, and a separate physical Functional Capacity Test. (R. 130-13 at 5.) In addition, prior to the simulation test, Dr. House represented that Dr. Williams's PTSD was subclinical. (R. 130-14.) Prior to requiring Dr. Williams to undergo the simulation, her department had subjected her to extensive evaluation and no longer had cause for concern; they simply did not want to do as recommended and require by law and accommodate Dr. Williams. Instead, they chose to continue to postpone her reinstatement and subject her to additional tests, in hopes that she would fail.

Lewis's letter which contained:

> After reviewing the Fitness for Duty and the Medical Certification, both physicians indicated that the employee could gradually return to full work status. There is no evidence or findings that the employee would pose a direct threat to herself nor others. It is therefore my recommendation that the employee be allowed to return to her duties as a Resident without further delay to her education. (R. 132-18.)

Therefore, there is substantial evidence that Drs. Meiler and Arthur required unlawful, excessive testing of Dr. Williams because they were not motivated by accommodating her or assessing her fitness for duty. Their motivation was to place as many obstacles in hopes that she would eventual trip and fall. There was no justification for delaying her accommodations to perform unnecessary and excessive

testing. Therefore, Dr. Williams's ADA and Rehabilitation Act claims for unlawful testing and failure to accommodate should not have been dismissed.

<u>Issue VIII- Whether the DC erred in finding that despite failing to comply with House Staff Policy 13, Appellees did not breach their contract with Dr. Williams.</u> (Count Fourteen)

Relying on *Jones*, the DC dismissed Dr. Williams' breach of contract claim because there was no due process violation after finding that BOR did not follow all policies of House Staff 13. (R.152 at 62.)  The Terms and Conditions for House Staff in this case states that "AU will develop a formal employment contract . . . The job description will address evaluation criteria, compliance with AU Health policies and procedures and the process for removal of residents from clinical duties for cause.  (R. 154-3; R. 130-76). Accordingly, Dr. Williams' case is distinguishable from *Jones* in that *Jones* involved a Plaintiff claiming entitlement to a process contained in a workplace policy manual in the absence of an employment contract. Here, Dr. Williams had a written contract which specifically incorporated by reference the terms that the Appellees breached and she seeks to enforce.  A jury could find breach of contract and due process violations. Despite being entitled to both, Dr. Williams did not receive an academic or employment appeal with notice of the charges against her or a hearing.

**CONCLUSION**

54

Wherefore, Dr. Williams prays that this Court will reverse the DC's grant of summary judgment on all claims and find that the evidence in the record in this case supports a  finding of intentional discrimination and retaliation by a reasonable jury because there are genuine issues of material fact that are raised by the conflicts in the evidence, weaknesses, implausibilities, inconsistencies and incoherencies which will necessarily be resolve based upon the credibility of the witnesses.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), excluding the portions excludable from that calculation pursuant to Fed. R. App. P. 32(f.) This document contains 12,968 words, excluding those portions excludable pursuant to Fed. R. App. P. 32(f.)

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 2007 in Times New Roman 14.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on November 21, 2023.

I certify that the following are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system:

Respectfully submitted,

_____

#